**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| LAURA SALO, | ) | CASE NO.  1:10-cv-2782 |
| obo D.P. | ) | |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Laura Salo ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's son, D.P. ("the claimant"), for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

# I.   PROCEDURAL HISTORY

On August 22, 2007, Plaintiff protectively filed an application for SSI on behalf of the claimant.  (Tr. 8.)  The application was denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 8.)  On June 26, 2009, an ALJ held the claimant's hearing by video conference.  (Tr. 8.) Plaintiff and the claimant appeared and testified.  (Tr. 8, 22.)  The claimant was represented by counsel.  (Tr. 8, 21.)  On July 23, 2009, the ALJ found the claimant not disabled.  (Tr. 20.)  On October 18, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On December 7, 2010, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On June 21, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 16.)  On September 13, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 20.) Plaintiff did not file a Reply Brief.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence for two reasons:  (1) the ALJ improperly gave the claimant's treating psychiatrist's opinion little weight; and (2) the ALJ's decision is not based on the record as a whole.

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

The claimant was ten years old and in the fifth grade on the date of his hearing before the ALJ.  (Tr. 25.)

2

### B.    Medical Evidence

On July 27, 2007, Plaintiff brought the claimant to psychiatrist Dr. Krishna Devulapalli, M.D., for psychiatric evaluation and treatment.  (Tr. 411.)  Dr. Devulapalli indicated that Plaintiff reported the following.  The claimant had significant behavioral problems the prior school year and was unable to focus.  (Tr. 411.)  He had a history of inattention and hyperactive behaviors since his preschool years, but his symptoms had become worse.  (Tr. 411.)  He was "very fidgety" and "restless," and could not sit still to watch television or movies; however, he was not aggressive.  (Tr. 411.)

Upon examination, Dr. Devulapalli reported the following.  The claimant was "fairly cooperative," although he was "quite fidgety and restless."  (Tr. 411.)  His speech was clear and coherent.  (Tr. 411.)  There was no evidence of depressive symptoms, significant mood swings, or delusional or hallucinatory thinking.  (Tr. 411.)  "His insight and judgment appeared to be fair to limited," and "[h]e appeared to be at least at average intellectual functioning given the vocabulary and fund of knowledge."  (Tr. 411.)

Dr. Devulapalli noted that, given the claimant's history and symptomatology, the claimant "appears to be having predominantly ADHD symptoms."  (Tr. 411.)  Dr. Devulapalli diagnosed the claimant with "ADHD Combined type"; noted that the claimant had "[p]roblems with primary support group [and] social & academic functioning"; and assigned the claimant a Global Assessment of Functioning ("GAF") score of 45.[1]  (Tr. 411.)  Dr. Devulapalli prescribed the claimant Concerta.  (Tr. 411.)

---

[1]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See* Diagnostic and Statistical Manual of

On August 24, 2007, Dr. Devulapalli increased the claimant's dosage of Concerta.  (Tr. 410.)  On October 3, 2007, Dr. Devulapalli indicated that Plaintiff reported the claimant was "doing fairly well since the adjustment of his medicine," so Dr. Devulapalli continued the claimant on the current dosage.  (Tr. 409.)

In October and November 2007, state agency reviewing physicians and psychologists Malika Haque, M.D., Karen Carver, M.A., and R. Kevin Goeke, Ph.D., authored a Childhood Disability Evaluation Form and indicated the following.  (Tr. 338-44.)  Plaintiff suffered mild expressive language delays and "ADHD, combined type." (Tr. 339.)  These impairments, or a combination of them, were severe but did not meet, medically equal, or functionally equal the listings.  (Tr. 339.)  The claimant was less than markedly limited in the domains of acquiring and using information; attending to and completing tasks; and interacting and relating with others.  (Tr. 341.)  He had no limitations in the domains of moving about and manipulating objects; caring for himself; and his health and physical well-being.  (Tr. 342.)  In March 2008, state agency reviewing physicians and psychologists Melissa Hall, M.A., Steven Meyer, Ph.D., and Silvia Vasquez, M.D., affirmed these findings.  (Tr. 345, 346, 347.)

Plaintiff continued to present the claimant to Dr. Devulapalli from November 2007 through March 2009.  (Tr. 354-431.)  Dr. Devulapalli reported the following throughout these evaluations.

In November and December 2007, Plaintiff reported that the claimant's medication wore off too quickly and that, when the claimant was not under the influence

---

Mental Disorders 34 (American Psychiatric Association, 4th ed. rev., 2000).

4

of his medication, he was "totally hyperactive."  (Tr. 407-08.)  Dr. Devulapalli indicated, however, that he would maintain the claimant on the current dosage of medication.  (Tr. 407-08.)

In January and February 2008, Plaintiff reported that she had no significant complaints about the claimant and that the claimant was "doing well."  (Tr. 405-06.)  On March 19, 2008, however, Plaintiff was concerned about a decrease in the claimant's appetite, so Dr. Devulapalli prescribed the claimant Periactin to improve the claimant's appetite.  (Tr. 404.)  On April 23, 2008, Plaintiff reported that the claimant ate and slept well and did not exhibit hyperactive tendencies while on Concerta.  (Tr. 403.)

On May 30, 2008, Plaintiff reported that the claimant's eating habits "have been still picky," and that the claimant "has been having overwhelming anxiety and phobias related to bugs and he has been afraid to go out and play."  (Tr. 402.)  Upon examination, the claimant's mood and affect appeared anxious.  (Tr. 402.)  He became frightened by a bee outside the window and moved "very close" to his mother.  (Tr. 402.)  Furthermore, "[h]e kept on saying that he did not want to be away from his mother going to Washington D.C."  (Tr. 402.)  In his assessment, Dr. Devulapalli indicated that the claimant had a history of ADHD and "also appears to be having Anxiety symptoms."  (Tr. 402.)  Dr. Devulapalli reduced the claimants dosage of Concerta and encouraged Plaintiff to give the claimant Periactin not only to increase his appetite, but also to help his anxiety.  (Tr. 402.)

On July 2008, Plaintiff reported that the claimant's appetite had increased since the dosage of Concerta was reduced.  (Tr. 357.)  She also reported that the claimant had "missed his medications."  (Tr. 357.)  Upon examination, the claimant was

5

"somewhat hyperactive" and needed frequent re-directions; Dr. Devulapalli attributed the claimant's condition to his failure to take his medication that day.  (Tr. 357.)  Dr. Devulapalli assessed the claimant with a history of ADHD, maintained the claimant's dosage of Concerta, and prescribed the claimant Atarax "to contain his anxiety as he was concerned about bees."  (Tr. 357.)  On August 4, 2008, Plaintiff had no significant complaints about the claimant and reported that the claimant was no longer afraid of bugs after taking Atarax.  (Tr. 354.)

On October 10, 2008, Plaintiff reported that she discontinued the claimant on Concerta because, although it helped the claimant focus, it made the claimant "extremely emotional" and caused problems at school.  (Tr. 431.)  Upon examination, the claimant was "quite hyperactive" and "needed frequent redirection"; however, there was no evidence of depressive symptoms or major mood swings.  (Tr. 431.)  Dr. Devulapalli assessed the claimant with a "history of ADHD and Anxiety disorder."  (Tr. 431.)  Dr. Devulapalli began the claimant on Strattera and continued him on Atarax. (Tr. 431.)  On November 21, 2008, Plaintiff reported that she had not noticed much improvement in the claimant's condition since the claimant was given Strattera, so Dr. Devulapalli increased the dosage.  (Tr. 429.)

On December 19, 2008, Dr. Devulapalli completed a questionnaire on medical and functional equivalence and indicated the following.  (Tr. 359-62.)  The claimant was markedly limited in the domains of acquiring and using information; attending to and completing tasks; interacting and relating with others; and moving about and manipulating objects.  (Tr. 359-60.)  He was moderately limited in the domains of caring for himself and his health and physical well-being.  (Tr. 361.)  The claimant did not

6

suffer side effects from his medications and did not have problems with school attendance.  (Tr. 361.)  Dr. Devulapali summarized that the claimant "has ADHD [and] it interferes with his functioning."  (Tr. 361.)

On January 9, 2009, Plaintiff reported that she believed the claimant had done better while on Concerta, and that the claimant was still not focusing in school and "has a tendency for increased anxiety."  (Tr. 428.)  Dr. Devulapalli noted that the claimant's parents had split up and that the claimant may be experiencing anxiety as a result.  (Tr. 428.)  Upon examination, the claimant was "mostly focused on his Game boy," and "needed some redirection."  (Tr. 428.)  Dr. Devulapalli indicated that the claimant "has been diagnosed with having ADHD," and that the claimant was taking Concerta and Atarax.  (Tr. 428.)

On March 30, 2009, Plaintiff wondered if the claimant's medication should be changed again; she believed the Concerta was not helping the claimant because the claimant's teachers had been complaining about the claimant's disruptive "hyper-talkativeness" in class.  (Tr. 427.)  Upon examination, the claimant was "hyperactive," but his mood was "euthymic."  (Tr. 427.)  Dr. Devulapalli decided to discontinue the claimant on Concerta and give him Adderall instead.  (Tr. 427.)

### C.    The Claimant's Teachers' Reports

On September 28, 2007, the claimant's special education teacher, Ms. Kim Kreider, completed a Teacher Questionnaire form and indicated the following about the claimant's performance at school.  (Tr. 119-26.)  The claimant was in the third grade; and his reading, math, and written language skills were at the third-grade level.  (Tr. 119.)  The claimant required special education instruction daily to help with his

7

attention, but he required only re-direction to focus him on tasks at hand.  (Tr. 119, 121.)  In the domain of acquiring and using information, he had "an obvious problem" with comprehending oral instructions and participating in class discussion.[2]  (Tr. 120.)  He had "a slight problem" with reading and comprehending written material; comprehending and doing math problems; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions.  (Tr. 120.)  Ms. Kreider clarified that the claimant's main problem was paying attention and staying focused on tasks in class, and that the claimant had no problem with comprehension.  (Tr. 120.)

In the domain of attending to and completing tasks, the claimant had "a serious problem" with paying attention when spoken to directly; focusing long enough to finish assigned activities or tasks; and refocusing on tasks when necessary.  (Tr. 121.)  He had "a slight problem" with carrying out single- and multi-step instructions; organizing his personal effects and school materials; completing classwork and homework; and working without becoming distracted.  (Tr. 121.)

The claimant had no problems in the domains of interacting and relating with others; moving about and manipulating objects; and caring for himself.  (Tr. 122-24.)

On February 25, 2008, the claimant's third grade teacher, Mr. Bill Ricker, completed a Teacher Questionnaire form and indicated the following.  (Tr. 175-82.)  In the domain of acquiring and using information, he had "a slight problem" with

---

[2] The rating system on the Teacher Questionnaire form spans a scale between 1 and 5:  1 represents "no problem"; 2 represents "a slight problem"; 3 represents "an obvious problem"; 4 represents "a serious problem"; and 5 represents "a very serious problem."  (*See, e.g.*, Tr. 120.)

comprehending oral instructions; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; expressing ideas in written form; learning new material; and applying problem-solving skills in class discussions.  (Tr. 176.)  Mr. Ricker noted that the claimant was in an "inclusion classroom" wherein he could obtain re-direction from another teacher when he got off task (which was about 30 percent of the time).  (Tr. 176.)

In the domain of attending to and completing tasks, the claimant had "a slight problem" with sustaining attention during play or sports activities; focusing long enough to finish assigned activities or tasks; refocusing on tasks when necessary; carrying out multi-step instructions; working without distracting himself or others; and working at a reasonable pace and finishing tasks on time.  (Tr. 177.)  Mr. Ricker clarified that the claimant's "work pace is slow but accurate," and that when he became distracted he "will refocus with a verbal reminder."  (Tr. 177.)

The claimant had no problems in the domains of interacting and relating with others; moving about and manipulating objects; and caring for himself.  (Tr. 178-80.)  Mr. Ricker noted that the claimant took medication and that, when the claimant took his medication, he was able to focus and refrain from distracting himself.  (Tr. 181.)

On August 28, 2008, Ms. Kreider completed another Teacher Questionnaire form and indicated the following.  (Tr. 268-75.)  The claimant was in the fourth grade; and his reading, math, and written language skills were at the fourth-grade level.  (Tr. 268.)  In the domain of acquiring and using information, he had "an obvious problem" with understanding and participating in class discussions; and he had "a slight problem" with comprehending oral instructions.  (Tr. 269.)  Ms. Kreider specified that the claimant

9

"needs support to stay on task, focus on activities and support [and] prompting to participate."  (Tr. 269.)

In the domain of attending to and completing tasks, he had "an obvious problem" with refocusing on tasks when necessary; and "a slight problem" with paying attention when spoken to directly, carrying out single- and multi-step instructions, and working at a reasonable pace and finishing tasks on time.  (Tr. 270.)  Ms. Kreider further explained that the claimant "has a slow work pace" but "is a hard worker and when focused completes his work accurately."  (Tr. 270.)  His main problem, Ms. Kreider continued, is that "he is thinking about other things during instruction activities so he is not focused on the lesson."  (Tr. 270.)

The claimant had no problems in the domains of interacting and relating with others; moving about and manipulating objects; and caring for himself.  (Tr. 271-73.) Ms. Kreider noted that the claimant took mediation for his attention deficit and that, when he took his medication, he was able to focus much better.  (Tr. 274.)  Ms. Kreider additionally noted that, even though the claimant "is inattentive at times, especially when he does not have his medication," he "is a hard worker who is a quality citizen at school."  (Tr. 275.)

On the claimant's fourth grade progress report, the claimant's teacher, Mrs. Esposito, reported the following.  In the first nine-week grading period, the claimant "struggles to keep up," as the "fourth grade is very challenging for him."  (Tr. 337.)  In the second nine-week grading period, the claimant "requires a lot of extra help and explanation"; his "[b]ehaviors are a problem"; and "[h]e does not always turn in work." (Tr. 337.)  In the third nine-week grading period, he "needs to stay caught up with all

10

work daily" and "needs to use his time wisely and work more independently."  (Tr. 337.)

### D.    Hearing Testimony

#### 1.    The Claimant's Testimony

The claimant testified at his hearing as follows.  He was ten year old and in the fifth grade.  (Tr. 25.)  He was not aware of how well he had been doing in school because he did not receive a report card.  (Tr. 25-26.)  But he enjoyed school— particularly math class and recess.  (Tr. 26.)  He played outside during recess unless it rained, in which case he stayed inside and played games, colored, and read books. (Tr. 26.)  He liked only one classmate at school; allegedly, everyone else hated the claimant.  (Tr. 27-28.)

At home, the claimant played "electronic games."  (Tr. 26-27.)  He used to ride his bicycle, but somebody stole it.  (Tr. 27.)  He used to play soccer but his mother took him off the team.  (Tr. 27.)  He did not enjoy football because he was tackled too often. (Tr. 27.)  But he enjoyed basketball; sometimes, he was able to shoot the ball to the net from the "foul line."  (Tr. 27.)

The claimant completed his homework at night; and he was able to brush his teeth, take a bath, and comb his hair by himself.  (Tr. 28.)

#### 2.    Plaintiff's Testimony

Plaintiff testified about the claimant at the claimant's hearing as follows.  The claimant was enrolled in regular classes.  (Tr. 28.)  He did, in fact, receive a report card—he received "D's and C's and A's in gym and music" and "a couple B's."  (Tr. 28.) He also attended speech therapy.  (Tr. 30.)  He did not have any friends that visited his

home.  (Tr. 29.)  Plaintiff believed the claimant did not have many friends because "he's immature for his age and they're not . . . on the same level.  (Tr. 29.)  The claimant got along better with younger children, and "[a]ll his friends are younger than him."  (Tr. 29.)

The claimant used to get pulled out of classes when there were tests so that someone could read the tests to him.  (Tr. 29.)  His biggest issue at school was being disruptive during class.  (Tr. 30.)  For example, "if he sees a bug he will scream at the top of his lungs."  (Tr. 30.)  He also talked loudly, interrupted his teacher, and could not sit still.  (Tr. 30.)  He "got a lot of detentions"; Plaintiff received telephone calls from the claimant's school, and the school would pursue disciplinary action, once or twice every week.  (Tr. 34.)

The claimant's psychologist diagnosed the claimant with ADHD in 2007.  (Tr. 30-31.)  The claimant took Adderall and another anti-anxiety medication.  (Tr. 30.)  He did not take Ritalin.  (Tr. 35.)  The medications caused the claimant to lose his appetite and made him unable to sleep.  (Tr. 31.)  The claimant's "phobia" of bugs began at the same time he began taking his medication in 2007.  (Tr. 32.)  His medication was time-released, so by the time he returned home from school his symptoms were not controlled.  (Tr. 31.)  For example, the claimant would go outside to play and wander off, and Plaintiff had to call the police to find him.  (Tr. 31.)  The claimant also needed to be told to do things "over and over and over again."  (Tr. 31.)

The claimant's grandmother used to watch the claimant, but she could not do so anymore because she could not control the claimant—the claimant would not listen to her and instead would run away.  (Tr. 32.)

Plaintiff tried to get the claimant involved in baseball, but the claimant did not

12

want to join the team because he did not like being outside with the bugs and he thought baseball was boring.  (Tr. 33.)

### III.  STANDARD FOR DISABILITY

The Welfare Reform Act amended certain provisions of Title XVI of the Social Security Act relating to children's SSI applications.  *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002).  The Welfare Reform Act provides the following standard for determining whether a child is disabled under the Social Security Act:

> An individual under the age of 18 shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine*, 37 F. App'x at 147.  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(a).  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *Id.*  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *Id.*; *Miller ex rel.*

13

*Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  20 C.F.R. § 416.924(a); *Miller ex rel. Devine, 37 F. App'x at 148*.

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant was born on April 20, 1999.  Therefore, he was a school-aged child on August 22, 2007, the date the application was filed, and is currently a school-aged child.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3.    The claimant has the following severe impairments:  attention deficit hyperactivity disorder (ADHD) and a mild language delay.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6.    The claimant has not been disabled, as defined in the Social Security Act, since August 22, 2007, the date the application was filed.

(Tr. 11-20.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

14

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    The ALJ's Assessment of the Claimant's Treating Psychiatrist**

Plaintiff contends that the ALJ failed to consider certain factors relevant to determining the weight to give Dr. Devulapalli's opinion and failed to give good reasons for giving Dr. Devulapalli's opinion little weight.  For the following reasons, the Court disagrees.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic

15

techniques and not inconsistent with the other substantial evidence in the case record."

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §

404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may

be given little weight if it is unsupported by sufficient clinical findings and is inconsistent

with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).

If the opinion of a treating source is not accorded controlling weight, the ALJ must

consider certain factors in determining what weight to give the opinion, including:  (1)

the length of the treatment relationship and the frequency of examination; (2) the nature

and extent of the treatment relationship; (3) the supportability of the opinion; (4) the

consistency of the opinion with the record as a whole; and (5) the specialization of the

treating source.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007)

(citing *Wilson*, 378 F.3d at 544 and 20 C.F.R. § 404.1527(d)(2)).  Moreover, if an ALJ

decides to give a treating source's opinion less than controlling weight, he must give

"good reasons" for doing so that are sufficiently specific to make clear to any

subsequent reviewers the weight given to the treating physician's opinion and the

reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL

374188, at *5 (1996)).

 The ALJ noted that Plaintiff alleged the claimant had difficulty focusing, sitting

still, and paying attention; did not always follow instructions and complete chores; and

required constant repetition and re-direction to complete tasks.  (Tr. 13.)  The ALJ also

noted that the claimant's teachers reported the claimant was able to focus much better

and complete tasks when he took his medication.  (Tr. 13.)  The ALJ recognized that

Dr. Devulapalli was the claimant's treating psychiatrist but gave Dr. Devulapalli's

opinion little weight for the following reasons:

> This report is entirely inconsistent with the reports of [the claimant's] teachers
> and with the record as a whole.  Significantly, none of [the claimant's
> teachers report any limitation in the functional domains of "interacting and
> relating with others," "moving about and manipulating objects," or "caring for
> self" . . . .  Dr. Devulapalli's own treatment notes indicate some hyperactivity
> and lack of focus, but they do not support the degree of limitation reported
> in the December 2008 assessment . . . .  Dr. Devulapalli appears to base
> [his] conclusions primarily on the claimant's mother's subjective complaints,
> which are not totally credible, and not on clinical findings on examination.
> Therefore, this opinion has been given only minimal weight.

(Tr. 14) (internal citations omitted).  In other words, the ALJ gave Dr. Devulapalli's

opinion little weight because it was unsupported by sufficient clinical findings and was

inconsistent with the rest of the evidence.  These were appropriate reasons to reject Dr.

Devulapalli's opinion, and the Court finds no basis to conclude that the ALJ did not

consider the relevant factors in making this credibility determination.

Plaintiff contends, however, that Dr. Devulapalli's treatment notes support his

opinion of the claimant's limitations, as the notes indicate the claimant was sometimes

"quite hyperactive," needed re-direction, and was overly focused on his Gameboy.  This

contention lacks merit because a decision supported by substantial evidence will not be

overturned even though substantial evidence also supports the opposite conclusion,

and the ALJ's assessment of Dr. Devulapalli's opinion is supported by substantial

evidence.  In sum, the Court finds that the ALJ did not improperly assess Dr.

Devulapalli's opinion; therefore, remand is not warranted on this issue.

### D.    Whether the ALJ Considered the Record as a Whole

Plaintiff contends that the ALJ erroneously failed to consider the claimant's

17

anxiety, as he did not discuss the claimant's anxiety in his decision.  For the following reasons, the Court finds that although the ALJ failed to discuss evidence of the claimant's anxiety, such a failure was harmless.

An ALJ is supposed to consider all of a child-claimant's alleged impairments and the combined effect of those impairments on the child's overall health and functioning. *See* 20 C.F.R. § 416.924(a).  "It is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 545 (6th Cir. 2004)*.  Generally, however, courts review decisions of administrative agencies for harmless error. *Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535 (6th Cir. 2001)*; *NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)* (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality").  Accordingly, if an agency has failed to adhere to its own procedures, courts will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. U.S. Civil Serv. Comm'n, 721 F.2d 1054, 1056 (6th Cir. 1983)*; *see also Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 539 (1970)* (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. *Shinseki v. Sanders, 556 U.S. 396, ___, 129 S. Ct. 1696, 1706 (2009)*.

Here, there was evidence that the claimant occasionally suffered anxiety and

18

was given medication to control those symptoms, and the ALJ did not mention in his decision the claimant's anxiety or related medication.  Plaintiff does not argue that the ALJ's failure to address the claimant's anxiety deprived the claimant of a substantial right; Plaintiff argues only that the claimant's anxiety symptoms are unique and, therefore, should have been considered with the claimant's other impairments to appropriately determine the claimant's disability status.  But there is no basis in the record to conclude that the claimant was particularly limited by his anxiety symptoms and medication and that the claimant was prejudiced by the ALJ's failure to directly address such evidence in his decision.

Plaintiff never alleged in the claimant's disability application that the claimant was impaired by anxiety; rather, Plaintiff alleged that the claimant was disabled by ADHD and speech problems.  (Tr. 39, 48.)  The determination as to whether a claimant has an impairment is primarily based on medical evidence, *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 20 C.F.R. § 416.913(a)), and the medical evidence here does not indicate that the claimant was particularly impaired by anxiety.  Dr. Devulapalli reported in his December 2008 opinion that the claimant's only problem was his ADHD and that the claimant did not suffer side effects from his medications.  Although Dr. Devulapalli indicated in a few treatment notes that the claimant had anxiety symptoms, he never indicated to what degree those symptoms limited the claimant.  Moreover, the state agency reviewing physicians and psychiatrists did not indicate that the claimant suffered or was limited by anxiety.

Plaintiff testified that the claimant would scream in class when he saw a bug and was hesitant to play outside for fear of bugs; however, the claimant's teachers'

19

evaluations—which the ALJ addressed—accounted for the claimants functioning at
school and did not indicate that the claimant had a particular problem with anxiety about
bugs or with anxiety generally.  Moreover, Dr. Devulapalli indicated that Plaintiff
reported the claimant's fear of bugs resolved after taking Adarax.  Because there is an
utter lack of evidence of the extent to which the claimant was limited by his anxiety,
there is no basis to conclude that the claimant was prejudiced by the ALJ's failure to
address the claimant's anxiety in his decision.  Accordingly, remand on this issue is not
necessary.  *See* *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting
*Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)) ("No principle of administrative
law or common sense requires us to remand a case in quest of a perfect opinion unless
there is reason to believe that the remand might lead to a different result.").

Plaintiff also contends that the ALJ erroneously failed to consider the claimant's
fourth grade teacher's notes contained on the claimant's fourth grade report card, as
the ALJ did not address the report card in his decision.  The Court disagrees.  The
claimant's fourth grade teacher's notes indicating that the claimant struggled to stay
focused and on task in class were consistent with the rest of the evidence in the record,
so the Court finds no basis to conclude the ALJ did not consider it.  *See* *Kornecky v.*
*Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral*
*Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)) ("An ALJ can consider
all the evidence without directly addressing in his written decision every piece of
evidence submitted by a party.").

Finally, Plaintiff contends that the ALJ erroneously relied on the opinions of the

20

state agency reviewing physicians and psychiatrists rather than Dr. Devulapalli's

opinion because the state agency opinions are older than Dr. Devulapalli's December

2008 opinion and do not account for it.  Plaintiff cites no legal authority in support of this

contention.  Moreover, the ALJ is required to consider all of the relevant evidence in the

claimant's case record, including information from nonmedical sources such as parents

and teachers, *see* 20 C.F.R. § 416.924a(a), and the ALJ found the state agency

opinions consistent with the claimant's school records and other evidence.  Plaintiff

does not explain how this was an insufficient basis to give the state agency opinions

weight.  (Tr. 14.)  Accordingly, this contention lacks merit.

In short, there is no basis to conclude that the ALJ failed to consider the record

as a whole or that the claimant was prejudiced by the ALJ's failure to discuss certain

evidence in his decision.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  November 16, 2011

21